UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

RYAN, BECK & CO., LLC,

                              Plaintiff,

                -against-

YOUSSEF FAKIH, et al.,

                              Defendants.

-----------------------------------------------------------x

**FAXED**
6/20/03

**MEMORANDUM AND ORDER**

02-CV-4052 (RLM)

**FILED**
IN CLERKS OFFICE
U.S. ~ COURT ED N.Y:

★ JUN 2 3 2003 ★

P.M. _____
TIME A.M. _____

ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:

       Plaintiff Ryan, Beck & Co., LLC ("plaintiff" or "Ryan Beck") filed this action against

defendants Perry S. Reich ("Reich"), Franka Jones, as trustee of the Franka Jones Trust

("Jones"), and Youssef and Ali Fakih ("the Fakihs") (collectively referred to herein as "the

investors" or "defendants"), seeking the following relief:  a declaratory judgment that Ryan

Beck has no obligation to arbitrate certain disputes with the investors; a stay of three pending

arbitrations brought by the investors against Ryan Beck; and a declaratory judgment absolving

Ryan Beck of liability for the acts that are the subject of those arbitrations.  See generally

Complaint ("Compl.") at ¶¶ 8, 10-20 and *ad damnum clause.*

       Currently before this Court, following the parties' consent to have a magistrate judge

handle the case for all purposes (see 28 U.S.C. § 636(c)(1)), are various dispositive motions

and cross-motions filed by Ryan Beck, Jones and the Fakihs.[1]  Specifically, Ryan Beck has

moved for summary judgment on its second claim for declaratory relief (i.e., adjudging the

_____

[1] Ryan Beck's motion for sanctions against Reich, and Reich's cross-motion for sanctions
against Ryan Beck, were denied from the bench during oral argument on January 21, 2003.
See Transcript of Proceedings on January 21, 2003 ("1/21/03 Tr.") at 15.  (All transcripts of
court proceedings are cited herein as "[date] Tr.")

parties' disputes non-arbitrable) and demands a permanent stay of each of the arbitrations

pending against it. All three groups of investors[2] have filed papers opposing Ryan Beck's

motions,[3] and Jones and the Fakihs have cross-moved to compel arbitration.[4]

For the reasons that follow, the Court denies Ryan Beck's motions in all respects and

grants in part the cross-motions of the Fakihs and Jones, directing Ryan Beck to arbitrate the

issue of arbitrability with respect to those investors. Reich's arbitration proceeding is hereby

stayed pending the outcome of this lawsuit.

## FACTUAL BACKGROUND[5]

Several years ago, each of the investors opened an account with Gruntal & Co., L.L.C.

("Gruntal"),[6] which was then registered with the Securities and Exchange Commission as a

---

[2] For ease of reference, the Fakihs hereinafter will be referred to as one investor.

[3] Because the parties have filed numerous briefs and affidavits, references to the parties' submissions will, in order to avoid confusion, include the document number ["# "] as reflected on the docket sheet.

[4] Although all three investors have signed onto the Defendants' Joint Memorandum of Law in Support of Their Cross-Motion to Compel Plaintiff to Submit to Arbitration and in Opposition to Plaintiff's Motion ("Def. Joint Mem." [#99]), Reich has not filed any notice of cross-motion. For the reasons detailed in this opinion, Reich's situation is materially distinguishable from that of his co-defendants and, had he cross-moved for declaratory relief and/or to compel arbitration, this Court would have denied the motion.

The Fakihs' Notice of Cross-Motion (#94) seeks "an order declaring that the plaintiff must arbitrate" its dispute with them. No party has addressed the distinction between an order declaring a duty to arbitrate versus an order compelling arbitration and thus, for purposes of this opinion, the Court will treat those concepts interchangeably.

[5] Unless otherwise indicated, the facts recounted are not in dispute.

[6] The Fakihs opened a joint account. Reich transferred his funds from another brokerage firm. See Deposition of Perry S. Reich, on October 30, 2002 ("Reich Dep."), attached as

(continued...)

broker-dealer and was a member of the New York Stock Exchange ("NYSE") and the National

Association of Securities Dealers ("NASD").  Upon becoming a client of Gruntal, each

investor entered into a form contract entitled "Client Agreement & Margin Agreement"

(hereinafter "Client Agreement").  See, e.g., Court Exhibit ("CX") 2; CX 3; 9/5/02 Tr. at 5-

6.[7]  Each such Client Agreement included a broadly worded arbitration provision, see, e.g.,

CX 2 and 3 at ¶ 16,[8] and provided that the Client Agreement would "inure to the benefit of

and be binding upon" the parties to the Client Agreement and, among others, their respective

---

[6](...continued)
Exhibit ("Ex.") A to Plaintiff's Supplemental Brief in Support of Its Motion for Summary
Judgment Against Defendant Perry Reich ("Pl. Supp. Br." [#90]) at 6, 15-16. (Reich also
opened a second account with his mother, but that account is not at issue in this action or in
Reich's pending arbitration. See Reich Dep. at 24-25.)

[7] The Jones and Fakih Client Agreements were marked as court exhibits at oral argument on
Ryan Beck's motion for a preliminary injunction.  (Although the proceeding was held on
September 4, 2002, the transcript is incorrectly dated September 5, 2002, and is therefore cited
as "9/5/02 Tr.")  Copies of the Jones and Fakih Client Agreements are also appended to the
submissions of their respective counsel. See Exhibit B to Affidavit [of Edward H. Glenn, Jr.]
in Support of Cross-Motion to Submit to Arbitration ("Glenn Aff." [#89]); Exhibit A to
Defendant Fakih's [sic] Response to Local 56.1 Statement ("Fakih 56. 1 Stmt." [#94]).

The Reich Client Agreement was included among the documents marked as Plaintiff's
Exhibit 2A ("PX 2A") at Reich's deposition (appended to Pl. Supp. Br. [#90]).  Although the
new account form attached to the Client Agreement was signed by a Gruntal account executive
and approved by a Gruntal manager, the Court's copies of the form and Client Agreement do
not appear to have been signed by Reich.  Inasmuch as no party has focused on the absence of
Reich's signature, the Court will assume that the Client Agreement reproduced within PX 2A
was the operative agreement between Gruntal and Reich.

[8] The Jones and Fakih Client Agreements provide in pertinent part that the parties thereto
"agree that all disputes that may arise between or among [those parties and certain specified
other parties], arising out of or relating to [that investor's] Accounts (except for regulated
commodity accounts), orders, transactions or any construction, performance or breach of this
or any other agreement between or among [the parties thereto] will be settled by arbitration."
CX 2 and 3 at ¶ 16.

-3-

successors and assigns. See id. at ¶ 17; PX 2A (#90 [Ex.A]), Client Agreement at ¶ 1.[9]

In March 2001, Reich notified Gruntal, in writing, that he had "made arrangements to move [his] accounts to another brokerage firm," and he directed Gruntal "not to make any further transactions with respect to this account." Letter from Perry S. Reich to Joseph Burgos, dated March 16, 2001, included in PX 2A and PX 4 (#90 [Ex.A]). The next day, in a follow-up letter to a Gruntal supervisor, Reich complained that his account manager had not "follow[ed his] directions," and he accused the account manager of seeking "to increase his personal commissions at [Reich's] continued expense." Letter from Perry S. Reich to Mark Serby, dated March 17, 2001, included in PX 4 (#90 [Ex.A]). Reich transferred all of the assets in his Gruntal accounts to Quick & Reilly on or about April 9, 2001. See Reich Dep. (#90 [Ex.A]) at 31-32. The accounts of the other defendants remained open in and after the end of April 2002. See 9/5/02 Tr. at 11; 1/21/03 Tr. at 21; see also id. at 48.

In June 2001, Reich initiated an arbitration proceeding before the NASD against Gruntal and its agent, Joseph Burgos, charging that his account had been mishandled. In April 2002, the Fakihs and Jones commenced similar arbitration proceedings against Gruntal and its agents: the Fakihs brought their claims before the NASD and Jones brought hers before the

---

[9] The language of the Client Agreement as to Reich differs from that of the Fakihs and Jones in respects not material to the issues in this case. The Reich Client Agreement provides, among other things, that "[a]ny dispute I now or hereafter may have with Gruntal or any of its current or former officers, directors, agents and/or employees, arising out of or relating to any of my accounts with Gruntal or to transactions heretofore or hereafter made therein or to any agreement between myself and Gruntal, shall be settled by arbitration." PX 2A (#90 [Ex.A]), Client Agreement at ¶ 14. Like the Jones and Fakih Client Agreements, Reich's Agreement further provides that it "shall inure to the benefit of and be binding upon you and me and our respective . . . successors and assigns." Id. at ¶ 1.

NYSE.

Later that month, on or about April 20, 2002, Ryan Beck, a broker-dealer headquartered in Livingston, New Jersey, entered into a series of interrelated agreements, including an amended asset acquisition agreement ("Acquisition Agreement"), with Gruntal, its parent company Gruntal Financial, L.L.C., and Gruntal Facilities Management, L.L.C.[10] Pursuant to the Acquisition Agreement, Ryan Beck agreed to purchase most of the assets of Gruntal, including customer accounts and related books and records.  The nature and effect of the transaction -- that is, whether it constituted a *de facto* merger or rendered Ryan Beck a successor-in-interest to Gruntal's liabilities -- are the subject of much controversy among the parties, as is the adequacy of the purchase price paid by Ryan Beck.  Part of the debate centers on a provision in the Acquisition Agreement, pursuant to which the parties to that contract agreed that, with certain exceptions not relevant here, Ryan Beck would not assume any of Gruntal's liabilities or obligations other than those arising as of the closing date, April 26, 2002 ("the Closing Date").  See Acquisition Agreement § 1(B)(2) (stating, *inter alia*, that Ryan Beck "will not assume . . . liabilities for litigation, arbitrations or other claims relating to operations prior to the Closing Date [April 26, 2002], whether instituted before or after the Closing Date . . . .").

On the Closing Date, the defendants and other investors were sent form letters on Gruntal letterhead, signed by the chairmen and chief executive officers of Gruntal and Ryan

---

[10] The Acquisition Agreement and related documents are attached as Exhibit A to the Affidavit of Robert M. Berson In Support of Plaintiff Ryan, Beck's Motion for Summary Judgment ("Berson Aff." [#55]).

Beck, respectively. Following the salutation "Dear Valued Client," each letter advised that Ryan Beck had acquired certain assets and liabilities of Gruntal; that the investor's account would be transferred to Ryan Beck, effective April 29, 2002, unless the investor immediately notified his or her account executive otherwise and made arrangements for the account and/or securities to be transferred elsewhere; and that the account would be serviced at Ryan Beck by the same account executive as at Gruntal.[11] It is undisputed that none of the defendants signed a new client agreement with Ryan Beck. See, e.g., 9/5/02 Tr. at 15. However, plaintiff acknowledges that the Gruntal Client Agreements with Jones and the Fakihs became the operative contracts with those customers. See 9/5/02 Tr. at 15-16, 25, 71-73; 10/11/02 Tr. at 19, 44-45; 1/21/03 Tr. at 21-23, 33, 48.

Within several months of Ryan Beck's acquisition of Gruntal's accounts and other assets, each of the investor-defendants amended his or her statement of claim in arbitration to add Ryan Beck as a respondent.[12] On June 25, 2002, Ryan Beck filed its answer to the Fakihs' arbitration claims, requesting their dismissal. The underlying arbitration proceedings have continued, subject to a stipulation by the defendants that they "will not assert or argue that further participation of Ryan, Beck & Co., L.L.C. in the [respective] arbitration proceeding[s]

---

[11] A sample of the form letter -- hereinafter referred to as the "Dear Client Letter" -- is attached as Exhibit A to the Glenn Affidavit (#89).

[12] Ryan Beck is a member of the NASD but, unlike Gruntal, is not a member of the NYSE. Plaintiff's complaint includes a cause of action seeking to stay the Jones arbitration proceeding on the ground that the NYSE "has no jurisdiction" over Ryan Beck. Compt. at ¶ 19. In order to simplify the issues before this Court, Jones agreed to and, in October 2002, did in fact refile her arbitration claims against Ryan Beck (which had been pending before the NYSE) with the NASD. See Stipulation of Defendant [Jones], dated September 18, 2002 (#51); 9/5/02 Tr. at 105-07; 10/11/02 Tr. at 30; 1/21/03 Tr. at 72.

. . . constitutes a waiver by Ryan, Beck & Co., L.L.C. of any rights it may have to contest the propriety of its inclusion in such arbitration proceeding[s]." Stipulation & Agreement of the Defendants, dated September 18, 2002 (#51); see 9/5/02 Tr. at 100-05.[13]

On July 17, 2002, Ryan Beck commenced this federal action with the filing of its complaint for declaratory and injunctive relief. On July 25, 2002, Ryan Beck sought a temporary restraining order, which was denied by the Honorable Edward R. Korman, who referred plaintiff's motion for a preliminary injunction to this magistrate judge.[14] After the motion was fully briefed and argued, and after the case was, with the parties' consent, reassigned to a magistrate judge for all purposes, this Court issued a Memorandum and Order on September 20, 2002, denying the motion for a preliminary injunction. See Memorandum & Order, dated September 20, 2002 ("9/20/02 M&O").[15] On October 11, 2002, the Court denied from the bench a cross-motion filed by the Fakihs to dismiss the action on the ground that Ryan Beck had waived its objection to arbitrability. See 10/11/02 Tr. at 4-7. The Court then ordered discovery limited to the issue of Reich's status as a customer of Ryan Beck (see id. at 54-57, 60-61) and established a briefing schedule on the cross-motions for summary judgment.

---

[13] The Jones arbitration hearing has been scheduled for January 2004; the Fakihs' arbitration hearing is scheduled for February and March 2004; the Reich hearing has not been set. See Letter to the Court dated April 11, 2003, from Joel E. Davidson, Esq. (#75); Letter to the Court dated June 12, 2003, from Stuart D. Meissner, Esq. (#109).

[14] Plaintiff at the same time moved for summary judgment, but this Court concluded that the motion was premature. See infra note 38.

[15] Plaintiff recently moved for reconsideration of the ruling as to the Fakihs, and the Court adhered to its decision. See Memorandum and Order dated June 3, 2003.

Gruntal filed for bankruptcy protection on October 30, 2002, in <u>In re GCO Services</u> <u>LLC</u>, No. 02-15360 (S.D.N.Y. Bankr.).  <u>See</u> Berson Aff. (#55) at ¶ 2.

DISCUSSION

### I.  The Parties' Positions

The investors advance a series of arguments as to why Ryan Beck is obligated to arbitrate the disputes at issue.  Looking first to traditional principles of contract and agency, the investors assert that, as plaintiff's customers, their relationships with Ryan Beck were governed by the Gruntal Client Agreements, each of which included an arbitration provision; therefore, they argue, Ryan Beck assumed the obligation to arbitrate the parties' disputes and, having derived the benefits of that contractual relationship, plaintiff is estopped from denying its duty to arbitrate.  <u>See</u> Def. Joint Mem. (#99) at 4-8.  Secondly, the investors contend that, apart from the aforesaid contractual right to arbitration, NASD rules compel member firms to arbitrate disputes with their customers.  <u>See</u> <u>id.</u> at 8-13.  Moreover, they claim, the scope of the arbitration clause in the Client Agreement is a matter for the arbitrators to decide.  <u>See</u> <u>id.</u> at 13-14.

Plaintiff resists arbitration on a number of grounds.  Relying principally on the disclaimer of liability contained in the Acquisition Agreement, Ryan Beck maintains that it did not agree to arbitrate "antecedent Gruntal disputes"[16] or "disputes relating to successor

---

[16]  Plaintiff's Reply Memorandum of Law in Support of Its Motion For Summary Judgment/Declaratory Judgment ("Pl. Reply" [#103]) at 2.

liability."[17] According to plaintiff, its arbitration agreement with former Gruntal customers did

not encompass "the subject matter of the [pending] arbitrations." Pl. Mem. (#87) at 3.

Plaintiff also disputes the investors' claim that the arbitrators should decide the scope of the

arbitration provision; in plaintiff's view, the "plain meaning" of the Acquisition Agreement

"reflects [plaintiff's] intent not to arbitrate . . . ." Pl. Reply (#103) at 3.

 Concerning the duty to arbitrate imposed by the NASD Code, plaintiff takes the

position that "customer" status must be determined as of the time of the alleged wrongdoing;

in this case, the investors were Gruntal customers when their claims arose. See Pl. Mem.

(#87) at 4-6; Pl. Reply (#103) at 8.

 As to Reich, plaintiff alleges that he never became a customer of Ryan Beck, as he

closed his Gruntal accounts and transferred his assets one year prior to the acquisition, see

generally Pl. Supp. Br. (#90); consequently, Reich "totally failed to prove that he has any

agreement to arbitrate" with Ryan Beck. Id. at 11.

 Finally, Reich maintains that he "must be deemed to have been a 'customer' of Ryan,

Beck," because he received a "Dear Client Letter" advising him of the acquisition. See

Memorandum of Law Regarding Perry Reich's Status as a Ryan, Beck Customer ("Reich

Mem." [#105]) at 1. He also invokes a series of theories for binding plaintiff, as a successor-

in-interest, to his Gruntal Client Agreement. See id. at 6.

## II. Arbitration:  General Legal Principles

 As a preliminary matter, while counsels' submissions are silent on this issue, it appears

---

[17] Id. at 8; see id. at 2-3; Plaintiff's Memorandum of Law In Support of Its Motion For
Summary Judgment/Declaratory Judgment ("Pl. Mem." [#87]) at 14.

that the parties' disputes are governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, inasmuch as (1) there are a series of written arbitration agreements (albeit ones whose applicability and scope are contested); (2) diversity provides an independent basis for federal jurisdiction; and (3) the arbitration provisions are contained in contracts affecting interstate commerce. See Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120 (2d Cir. 2003); ACEquip Ltd. v. Am. Eng'g Corp., 315 F.3d 151, 154 (2d Cir. 2003).  Pursuant to section 4 of the FAA, the role of the Court is "limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate . . . ." PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996); accord Shaw, 322 F.3d at 120.  The latter issue is not disputed, as Ryan Beck is protesting the arbitration proceedings.

As the Supreme Court has recently reiterated, the FAA expresses a strong federal policy favoring arbitration agreements. See Howsam v. Dean Witter Reynolds, Inc., 123 S.Ct. 588, 591 (2002) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)); see also PacifiCare Health Systems, Inc. v. Book, 123 S.Ct. 1531, 1536 n.2 (2003). The FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Moses H. Cone, 460 U.S. at 24 (quoted in National Union Fire Ins. Co. v. Belco Petroleum Corp., 88 F.3d 129, 133 (2d Cir. 1996)). "Whether a party is bound by an arbitration clause is governed by federal law," which creates a framework of presumptions that inform the Court's analysis. John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 58 (2d Cir. 2001).  Nevertheless, because arbitration "is a matter of contract," id. (quoting AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643,

-10-

648 (1986)), federal courts look to "general state law contract principles" to determine whether

the parties have in fact agreed to arbitrate. John Hancock, 254 F.3d at 58; see Bybyk, 81 F.3d

at 1200 (state law applies to "disputes arising out of the contractual relationship," but does not

impose "special rules limiting the authority of the arbitrators.") (quoting Mastrobuono v.

Shearson Lehman Hutton, Inc., 514 U.S. 52, 59, 64 (1995)); see also Shaw, 322 F.3d at 120.[18]

In light of liberal federal policy favoring arbitration agreements, "any doubts concerning

the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone, 460

U.S. at 24-25; accord Shaw, 322 F.3d at 120; Bybyk, 81 F.3d at 1198. This principle is,

however, subject to an important exception: when the ambiguity concerns who should

determine arbitrability, "[t]he law then reverses the presumption to favor judicial rather than

arbitral resolution." Shaw, 322 F.3d at 120 (citing First Options of Chicago, Inc. v. Kaplan,

514 U.S. 938, 944-45 (1995)); see Bybyk, 81 F.3d at 1198. Consequently, the issue of

arbitrability may be referred to the arbitrator if and only if "there is 'clear and unmistakable'

evidence from the arbitration agreement, as construed by the relevant state law, that the parties

intended that the question of arbitrability shall be decided by the arbitrator." Bybyk, 81 F.3d at

1198-99 (quoting First Options, 514 U.S. at 944); accord Howsam, 123 S.Ct. at 591; Shaw,

---

[18]  Each of the three Client Agreements in this case contains two choice-of-law-related
provisions.  The general choice-of-law provision in each states in pertinent part that "[t]his
Agreement and its enforcement will be governed by the laws of the State of New York without
regard to conflict of laws provisions." CX 2 and 3 at ¶ 17; PX 2A (#90 [Ex.A]), Client
Agreement at ¶ 1.  Each arbitration provision states, inter alia, that any arbitration proceeding
"will be conducted pursuant to applicable Federal laws, the laws of the State of New York,
without regard to the conflict of laws, and the rules of the selected arbitral facility." CX 2 and
3 at ¶ 16; PX 2A (#90 [Ex.A]), Client Agreement at ¶ 14. Given the interplay between federal
and state law, this opinion will rely for the most part on cases in this circuit applying New
York law. See Shaw, 322 F.2d at 12.

322 F.3d at 121; see Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003); Bell v.

Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002); see also Smith Barney Shearson Inc. v.

Sacharow, 91 N.Y.2d 39, 45-46, 666 N.Y.S.2d 990, 993 (1997) (applying New York law and

recognizing the same principles and presumptions).

     The threshold issue in this case is who should determine arbitrability; in other words,

should the Court or the arbitrators decide "whether the parties are bound by a given arbitration

clause," Howsam, 123 S.Ct. at 592, and resolve the parties' disagreements as to its scope?[19]

Because this determination entails an evaluation of the parties' intent, and because the facts as to

Reich differ markedly from those relating to his co-defendants, Reich's situation will be

separately addressed.

## III.  The Fakihs and Jones

### A.  The Contractual Duty to Arbitrate (Assumption/Estoppel)

     In contrast to its position concerning Reich, plaintiff has conceded that, by virtue of the

investors' "negative consent" in response to the notice of transfer contained in the "Dear Client

Letter,"[20] the Gruntal Client Agreements with the Fakihs and Jones became the controlling

contracts with those customers.  See 9/5/02 Tr. at 15-16, 25, 71-73; 10/11/02 Tr. 19, 44-45;

1/21/03 Tr. at 21-23, 33, 48.  The Second Circuit has recognized a series of "theories for

binding nonsignatories to arbitration agreements," including estoppel and the doctrine of

---

[19]  In Howsam, the Supreme Court narrowly construed "arbitrability" to encompass "gateway"
issues of this nature and to exclude "procedural" questions such as limitations defenses.  123
S.Ct. at 592.

[20]  See Pl. Mem. at 13-14; Berson Aff. (#55) at ¶¶ 7-8 & Ex.C.

assumption of the obligation to arbitrate.  Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64

F.3d 773, 776 (2d Cir. 1995); see Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith

Cogeneration Int'l, Inc., 198 F.3d 88, 97 (2d Cir. 1999).  As the Fakih and Jones Client

Agreements both contain arbitration provisions, there can be no dispute that, by adopting those

agreements as their own, Ryan Beck agreed to be bound by the terms of their arbitration clauses

and thus assumed the duty to arbitrate.  See, e.g., Shaw Group, Inc. v. Triplefine Int'l Corp.,

No. 01 Civ. 4273 (LMM), 2001 WL 883076, at *2 (S.D.N.Y. Aug. 3, 2001) (court orders one

of the petitioners, a non-signatory to a contract containing an arbitration clause, to arbitrate its

dispute with the respondent, a signatory, where it was uncontested that that contract had been

assumed by that petitioner as part of an acquisition of the assets of another entity that had

signed the contract), vacated in part on other grounds, 322 F.3d 115 (2d Cir. 2003)[21]; see also

Fidelity & Guar. Ins. Co. v. West Point Realty, Inc., No. 02 Civ. 1951 LMM, 2002 WL

1933780, at *4-5 (S.D.N.Y. Aug. 21, 2002) (plaintiff, which issued a performance bond and,

after its insured defaulted, entered into a Takeover Agreement that incorporated by reference

the original construction contract, was bound by the arbitration provision in the original

contract, although not a signatory thereto).[22]

---

[21]  On appeal in Shaw, the Second Circuit vacated another aspect of the district court's order, which had enjoined arbitration of a particular claim; the Court of Appeals left undisturbed the lower court's ruling that the non-signatory, "by assuming the assets of [the acquired entity], had obligated itself to comply with the arbitration provision of the Representation Agreement . . . ."  322 F.3d at 119.

[22]  The fact that the arbitration provisions at issue here specifically refer to Gruntal does not affect this conclusion.  See Fidelity, 2002 WL 1933780, at *5 (although language in the arbitration provision referred to the original contracting parties, the Takeover Agreement, by

(continued...)

-13-

In addition, Ryan Beck is bound to the arbitration agreements with the Fakihs and Jones under a theory of estoppel, which holds that "a nonsignatory to an agreement containing an arbitration clause may be compelled to arbitrate with a signatory where the nonsignatory knowingly accepts benefits derived directly from the agreement." E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc., No. 97 Civ. 7102 (LAK), 1998 WL 314767, at *3 (S.D.N.Y. June 15, 1998) (citing Thomson-CSF, 64 F.3d at 778-79).  Having taken over the Fakih and Jones accounts, assets and customer relationships, subject to the protections afforded the firm by the Client Agreements, Ryan Beck thereby derived direct benefits and is estopped from avoiding the duties imposed by the arbitration provisions contained in those agreements.[23]  See Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999); Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993).

## B. The Scope of The Duty to Arbitrate

### 1. *Who Determines Arbitrability*

Ryan Beck does not dispute that it agreed to arbitrate with the Fakihs and Jones; instead plaintiff argues that it did not agree to arbitrate the claims now pending in arbitration, which

---

[22](...continued)
substituting plaintiff for its insured, "place[d] [plaintiff] within the scope of the arbitration clause in the Original Contract." See 1/21/03 Tr. at 28-30, 46.

[23] Indeed, Ryan Beck has acknowledged that it derived a direct benefit from the arbitration clause itself, as well as from the Client Agreement as a whole: members of the NASD and NYSE are required by their rules to arbitrate with their customers at the customers' request, and thus a broker-dealer gains mutuality by including in a client agreement an arbitration clause by which the broker-dealer can compel the customer to arbitrate.  See 1/21/03 Tr. at 35-36; Berson Aff. (#55) at ¶ 9; see also Kidder, Peabody & Co. v. Zinsmeyer Trusts Partnership, 41 F.3d 861, 864 (2d Cir. 1994).

arose on Gruntal's watch. See Pl. Mem. (#87) at 3, 8, 14; Pl. Reply (#103) at 2-3; 1/21/03 Tr.
at 21-26. In other words, as to the Fakihs and Jones, plaintiff challenges the scope of the
arbitration agreements, but not their existence or validity. See generally Bell, 293 F.3d at 567-
68 (distinguishing between a challenge to the existence of an agreement to arbitrate and a
challenge to the scope of an arbitration provision).

Ordinarily, "a disagreement about whether an arbitration clause in a concededly binding
contract applies to a particular type of controversy is for the court," not the arbitrator, to
resolve. Howsam, 123 S.Ct. at 592. However, this presumption is subject to a significant
qualification: as previously noted, "under First Options and AT&T Technologies, the
arbitrability of a given issue is a question for the court unless there is 'clear and unmistakable'
evidence from the arbitration agreement, as construed by the relevant state law, that the parties
intended that the question of arbitrability shall be decided by the arbitrator." Bybyk, 81 F.3d at
1198-99 (emphasis in original). Under New York law, the "court must ascertain the intent of
the parties from the plain meaning of the language employed" in the agreement itself, id. at
1199 (quoting Tigue v. Commercial Life Ins. Co., 631 N.Y.S.2d 974, 975 (4th Dep't 1995)),
and, where "the intent of the parties can be determined from the face of the agreement,
interpretation is a matter of law . . . ." Bybyk, 81 F.3d at 1199 (quoting Am. Express Bank
Ltd. v. Uniroyal Inc., 562 N.Y.S.2d 613, 614 (1st Dep't 1990)).

The Second Circuit's recent decision in Shaw is instructive on this issue. There the
Court, faced with similarly broad language in an arbitration provision, vacated an order of the
district court enjoining the respondent from pursuing a certain claim in arbitration against a
party that, like Ryan Beck, was not a signatory to the arbitration agreement but had assumed the

-15-

contract containing the arbitration clause. See Shaw, 322 F.3d at 119, 125. Rejecting the district court's ruling, the Court of Appeals concluded that "the evidence manifests the parties' clear and unmistakable intent to submit questions of arbitrability" -- as here, issues concerning the scope of the arbitration provision -- "to arbitration." Id. at 121.

Applying New York contract law, the Court in Shaw inferred that intent from the language of the arbitration clause itself. First, the Court focused on the breadth of the referral to arbitration. Although the provision did not contain "an express contractual commitment of the issue of arbitrability to arbitration," the clause did provide for arbitration of "[a]ll disputes . . . concerning or arising out of" the Representation Agreement of which the clause was a part. See id. at 121. The Court viewed that language as sufficiently sweeping to indicate an intent to reserve the issue of arbitrability for the arbitrators. See id. (citing federal and New York cases construing similar provisions).

So too here, the relevant contractual provision states that "all disputes . . . arising out of or relating to [the investor's] Accounts, . . . or any construction, performance or breach of this or any other agreement between [the parties] will be settled by arbitration." CX 2 and 3 at ¶ 16.[24] Clearly, a referral of "all" disputes concerning the construction of the Client Agreement is sufficiently plain and sweeping to encompass disputes over the scope of the arbitration clause and to manifest the parties' intent to have the arbitrators decide that issue. See Bybyk, 81 F.3d at 1299 ("[t]he words 'any and all' are elastic enough to encompass disputes over whether a claim . . . is within the scope of arbitration. That provision expressly includes the category of

_____

[24] See supra note 8. The only carve-out relates to disputes arising out of or relating to "regulated commodity accounts," CX 2 and 3 at ¶ 16, which are not implicated here.

disputes regarding the construction of the Agreement . . . ."); <u>Optibase, Ltd. v. Merrill Lynch Inv. Managers</u>, No. 02 Civ. 9813 (LTS), 2003 WL 1587244, at *3-4 (S.D.N.Y. March 27, 2003) (arbitration clause that covered "all controversies that may arise . . ., including but not limited to, those involving . . . the construction, performance or breach of this or any other agreement . . .," required the court to defer to the arbitrator's arbitrability decision); <u>New Avex, Inc. v. Socata Aircraft Inc.</u>, No. 02 Civ. 6519 DLC, 2002 WL 1998193, at *1, 5-6 (S.D.N.Y. Aug. 29, 2002) (arbitrability issue was reserved for arbitration, where the arbitration clause encompassed "[a]ny dispute, controversy or claim arising under or related to this agreement, other than a dispute concerning a Withheld Amount . . . .").

In <u>Shaw</u>, the Second Circuit additionally found that "the parties' intent to arbitrate arbitrability [was] further evidenced by their agreement to refer all disputes to" the International Chamber of Commerce, the rules of which provide for the arbitral body to resolve questions of arbitrability. <u>Shaw</u>, 322 F.3d at 122. In this case, the arbitration clause in the Jones and Fakih Client Agreements expressly provides for arbitration proceedings before the NASD, conducted pursuant to "the rules of the selected arbitral facility." CX 2 and 3 at ¶ 16. As the Second Circuit recognized in <u>Bybyk</u>, the NASD Code commits "all issues, including issues of arbitrability . . ., to the arbitrators." 81 F.3d at 1202; <u>accord</u> <u>Shaw</u>, 322 F.3d at 123; <u>Howsam</u>, 123 S.Ct. at 593 (citing NASD Code of Arbitration Procedure § 10324). Consequently, the contractual reference to NASD arbitrations and rules provides further evidence of the parties' "clear and unmistakable intent" to submit questions of arbitrability to the arbitrators.

### 2. *The Language in the Acquisition Agreement*

In seeking to avoid arbitration, Ryan Beck relies on the "plain meaning" of the

-17-

Acquisition Agreement. <u>See</u> Pl. Reply (#103) at 3. That reliance is misplaced. First, as demonstrated by <u>Shaw</u>, <u>Bybyk</u>, and the New York cases cited therein, to determine the intent of the parties, the Court must look to the language of the arbitration provision and construe the contract of which it is a part. As the arbitration provision here is plain on its face,[25] extrinsic evidence may not be considered. <u>See</u> <u>Kidder, Peabody & Co. v. Zinsmeyer Trusts Partnership</u>, 41 F.3d 861, 865 (2d Cir. 1994) (citing <u>Int'l Klafter Co. v. Cont'l Cas. Co.</u>, 869 F.2d 96, 100 (2d Cir. 1989));[26] <u>see</u> <u>also</u> <u>John Hancock</u>, 254 F.3d at 60 (citing <u>Klafter</u>). This principle applies with particular force where, as here, the extrinsic evidence does not relate to discussions among the parties, but rather concerns a document to which the investors were not privy.

Whatever the intent of Ryan Beck and the Gruntal entities in entering into the Acquisition Agreement, it is undisputed that the terms of that document, and the temporal limit that plaintiff seeks to impose, were not communicated to Gruntal's customers -- in the "Dear Client Letter" or otherwise -- in soliciting their negative consent to transfer their accounts from Gruntal to Ryan Beck. <u>See</u> 1/21/03 Tr. at 24, 26, 34. Even assuming *arguendo* that the Acquisition Agreement may be read to limit Ryan Beck's duty to arbitrate claims arising prior to the Closing Date,[27] that

---

[25] <u>See</u> <u>generally</u> *infra* note 28.

[26] In <u>Kidder, Peabody</u>, the Second Circuit held that the excision, from a brokerage firm's Customer Agreement, of a provision authorizing either party to demand arbitration, did "not evidence a clear intent to waive the customer's arbitration right" under the NASD Code; the Court refused to consider the contents of the transmittal letter that accompanied the revised version of the Customer Agreement, as "there [was] no ambiguity" in that agreement and thus "no reason to incorporate the transmittal letter into the contract." 41 F.3d at 865.

[27] However, while disclaiming liability for antecedent claims, the language relied on (stating that Ryan Beck "will not assume . . . liabilities for litigation, arbitrations or other claims
(continued...)

limitation was not incorporated by reference into the Client Agreements assumed by Ryan Beck. Under New York law and the law of this Circuit, two essential elements must be satisfied before a document will be deemed to have been incorporated by reference into another instrument or agreement. First, the agreement must specifically reference and sufficiently describe the document to be incorporated, such that the latter "may be *identified beyond all reasonable doubt.*" Bybyk, 81 F.3d at 1201 (quoting Chiacchia v. Nat'l Westminster Bank USA, 507 N.Y.S.2d 888, 889-90 (2d Dep't 1986)) (emphasis supplied in Bybyk). Second, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." Bybyk, 81 F.3d at 1201 (quoting Lamb v. Emhart Corp., 47 F.3d 551, 558 (2d Cir. 1995)); see generally Federated Mut. Ins. Co. v. Woodstock '99, LLC, 140 F.Supp.2d 225, 228 (N.D.N.Y. 2001) (before a document will be deemed incorporated by reference, "the document to be incorporated must be identified with sufficient specificity," and "there must be a clear manifestation of an intent to be bound by the terms of the incorporated instrument.").

Neither of these elements is satisfied here. First, the Client Agreement in no way refers to a separate contract that was neither in existence nor even contemplated when the Client Agreement was executed. To the extent that the "Dear Client Letter" is regarded as a supplemental agreement substituting Ryan Beck for Gruntal, none of that letter's "oblique references to an otherwise unidentified [acquisition arrangement] meet[s] [the] exacting standard" for incorporation by reference. Shark Info. Servs. Corp. v. Crum & Forster

---

[27](...continued)
relating to operations prior to the Closing Date . . .," Acquisition Agreement § 1(B)(2) (#55 [Ex.A]), does not clearly disclaim the duty to arbitrate those claims. See 9/5/02 Tr. at 17-19; 1/21/03 Tr. at 27.

Commercial Ins., 634 N.Y.S.2d 700, 701 (1st Dep't 1995) (where insurance policy inadvertently omitted a flood exclusion, vague references in the policy to a separate "Coverage Form" were insufficient to bring the claimed exclusion within the policy under the doctrine of incorporation by reference).

Nor can it be said that the investors' "negative consent" to transfer their accounts to Ryan Beck in any way manifested their intent to be bound by the terms and conditions of a series of agreements that had not been provided or explained to them. See Federated, 140 F.Supp.2d at 228-29 (letter agreement between the sponsor of a music festival and a supplier did not incorporate by reference a waiver-of-the-right-to-subrogation provision contained in a separate agreement between the festival organizer and the sponsor, even though the letter agreement specifically referenced the agreement between the organizer and sponsor); see also Kidder, Peabody, 41 F.3d at 864-65; Thomson-CSF, 64 F.3d at 777. Accordingly, as a matter of basic contract law, the intent of the parties cannot be drawn from the Acquisition Agreement between Ryan Beck and the Gruntal entities.

### 3. *The Decision in Dusch*

To support its contention that Ryan Beck assumed the obligation to arbitrate only those claims arising after the Closing Date, plaintiff cites the district court's decision in Prudential-Bache Securities v. Dusch, No. 93-1470-IEG (RBB), 1994 WL 374425 (S.D. Cal. March 28, 1994). The Dusch opinion is of limited precedential value and persuasive force. First, the decision does not address the threshold question of who determines arbitrability -- an issue that, in this Circuit and on the facts of this case, mandates a ruling in favor of the Fakihs and Jones. Moreover, while the court in Dusch reached and resolved the scope of the duty to arbitrate, the

-20-

opinion does not quote the language of the arbitration provision, which was contained on the signature card that was transferred to Prudential Securities from Thompson McKinnon Securities when its assets were acquired by Prudential.  Indeed, in concluding that "the card does not apply to the time before Dusch became a customer of Prudential," id. at *2, the court focused instead on the language of the purchase agreement between Prudential and Thompson McKinnon.  See id.  As previously noted, such an analysis is at odds with case law in this Circuit and in New York State.

For the foregoing reasons, this Court must defer to the arbitrators on the parties' disputes about the arbitrability of the claims of the Fakihs and Jones.[28]

---

[28] Even if this Court agreed with Ryan Beck that the issue of arbitrability should not be reserved for the arbitrators, plaintiff's attempt to superimpose a temporal limitation onto the contractural arbitration provision would not succeed.  In accordance with the strong federal policy favoring arbitration, courts must "construe arbitration clauses as broadly as possible," Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 76 (2d Cir. 1998) (citation and internal quotation marks omitted), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." Moses H. Cone, 460 U.S. at 24-25; accord Bell, 293 F.3d at 566.  Furthermore, "the strong federal presumption in favor of arbitrability applies with greater force when an arbitration clause is a broad one," as here.  McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988) (citing AT&T Techs., 475 U.S. at 650); accord Oldroyd, 134 F.3d at 76.  Indeed, the presumption in favor of arbitrability is so strong that, upon finding a broad, enforceable arbitration agreement, the court must compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  AT&T Techs., 475 U.S. at 650; accord Mehler v. Terminix Int'l Co., 205 F.3d 44, 49 (2d Cir. 2000); see Smith/Enron, 198 F.3d at 99; Oldroyd, 134 F.3d at 76.

In this case, it cannot be said with positive assurance that the broad arbitration clause in the Client Agreement excludes arbitration of disputes arising prior to the Closing Date.  Indeed, Ryan Beck has conceded that the clause is silent on this issue (see 1/21/03 Tr. at 34; see also id. at 26) and that no such limitation was communicated to the investors whose accounts were transferred.  See id. at 24, 26.  Contrary to Ryan Beck's assumption, "the Second Circuit has expressly rejected the argument that securities industry arbitration agreements cannot be

(continued...)

-21-

## IV. Perry Reich

The facts as to Reich are entirely distinguishable, and the law thus compels a different result. Ryan Beck does not concede that it assumed Reich's Client Agreement with Gruntal; to the contrary, plaintiff argues that Reich never became its customer and that therefore those parties never entered into any arbitration agreement of any scope.

Under these circumstances, the parties' quarrel as to arbitrability may not be deferred to the arbitrators. As the Supreme Court has observed, "a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." Howsam, 123 S.Ct. at 592; see ACEquip, 315 F.3d at 155 ("[t]he first type of factual scenario, involving the existence of the arbitration agreement itself, generally presents an issue for the court to decide."); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 (1964) (court must decide whether an arbitration clause survived a corporate merger and bound the resulting corporation); Calamia v. Riversoft, Inc., No. 02-CV-1094 (FB) (RML), 2002 WL 31779991, at *5 (E.D.N.Y. Dec. 13, 2002) ("Whether . . . a non-signatory[] should be deemed a party to the agreement, and hence a party to the arbitration clause, under any of the traditional principles of

---

[28](...continued)
applied retroactively." Marcus v. Masucci, 118 F.Supp.2d 453, 457 (S.D.N.Y. 2000). Thus, where, as here, the arbitration clause did "not contain any temporal limitation," the Second Circuit has compelled arbitration despite the fact that the challenged conduct predated the signing of the parties' agreement. Smith/Enron, 198 F.3d at 99 ("SCI's argument that its claims against Enron concern events that predate the 1994 Agreement does not persuade us that the district court erred here in ordering arbitration.") (citing Coenen v. R.W. Pressprich & Co., 453 F.2d 1209, 1212 (2d Cir. 1972) ("we think the clause is clear on its face.  It reads 'any controversy,'" not "any future controversy . . . .")); see ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co., 307 F.3d 24, 31, 34 (2d Cir. 2002) (arbitration clause's "temporally non-limiting" language did not exclude disputes arising "pre- and post-contract formation.").

agency or contract law is an issue for the Court to decide.")  This Court must therefore

determine whether Ryan Beck is somehow bound to arbitrate Reich's claims against it.[29]

### A. Assumption/Estoppel (Reich's Customer Status)

The logical starting point in this analysis is an examination of the record to ascertain

whether Reich's theory that he became a Ryan Beck customer is factually sustainable.  In

determining arbitrability in connection with a motion to prevent arbitration, "the court applies a

standard similar to that applicable for a motion for summary judgment."  Bensadoun, 316 F.3d

at 175.  Thus, in ruling on Ryan Beck's motion, the Court must review the record to determine

whether there are any genuine issues of fact as to the making of an arbitration agreement with

Reich, so as to require a hearing.  See Fed. R. Civ. P. 56(c); Bensadoun, 316 F.3d at 175; cf. 9

U.S.C. § 4.  In this regard, "[t]he Supreme Court has held that 'the mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

fact.'"  Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 368 (2d Cir. 2003) (quoting

Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986) (emphasis in original)).

Judged by this standard, and with the evidence analyzed in light of New York contract

---

[29] To the extent that any of Reich's arguments may be read to suggest that Ryan Beck's
membership in the NASD in and of itself warrants submission of the arbitrability question to
the arbitral body, that argument is foreclosed by the Second Circuit's decision in John
Hancock, 254 F.3d at 53 ("John Hancock's membership in the NASD, without more, is not
sufficient to show that the parties agreed to submit the question of arbitrability to the
arbitrators . . . ."); see also id. at 57 ("absent an express agreement between the Investors and
John Hancock incorporating the NASD Code or providing 'any and all' disputes be settled in
arbitration, the district court properly undertook the determination of whether the Investors'
claims are arbitrable.").

law, Reich's submissions fail to create any genuine issue of material fact to support his theory

that he, like his co-defendants, became a customer of Ryan Beck, which thereby assumed the

benefits and obligations of his Client Agreement.

"Under New York law, a contract for services that makes no specific provision for

duration is presumed to be terminable at will." White Plains Towing Corp. v. Patterson, 991

F.2d 1049, 1062 (2d Cir. 1993). Reich's communications with Gruntal in March 2001,[30] and his

subsequent transfer of all of the assets in his accounts to another brokerage firm, clearly and

unequivocally indicated that he was terminating his relationship with Gruntal and rescinding

Gruntal's authority to act on his behalf.[31] Such a severance need not be preceded by any

particular verbal formulation.  New York courts have held that a "broker/principal relationship

and accompanying fiduciary duty can be severed by agreement of the parties or by unilateral

action of the principal." Dubbs v. Stribling & Assocs., 96 N.Y.2d 337, 340, 748 N.Y.S.2d

413, 415 (2001) (citations omitted); see Aegis Prop. Servs. Corp. v. Hotel Empire Corp., 484

N.Y.S.2d 555, 561 (1st Dep't 1985) ("the right of the principal to terminate [the broker's]

authority is absolute and unrestricted.") (citation and internal quotation marks omitted).

"Authority created in any manner terminates when either party in any manner manifests to the

other dissent to its continuance . . . ." Restatement (Second) of Agency § 119 (1985).

Accordingly, "[a] revocation of an agent's authority . . . may be implied by words or conduct

of a principal which are inconsistent with the continuation of authority." Whiting v. Marine

---

[30] See PX 2A and PX 4 (#90 [Ex.A]) (letters dated March 16, 2001, and March 17, 2001).

[31] Reich conceded as much at oral argument, stating that, in light of his actions terminating his
Client Agreement with Gruntal, "he's not a customer in that respect." 1/21/03 Tr. at 92.

<u>Midland Bank-Western</u>, 365 N.Y.S.2d 628, 644 (Sup. Ct. 1975); <u>see also</u> <u>Savitsky v. Sukenik</u>, 659 N.Y.S.2d 48, 50 (2d Dep't 1997) ("In general, abandonment of a contract need not be express, but may be inferred from the conduct of the parties and the attendant circumstances.") (citing <u>Rosiny v. Schmidt</u>, 587 N.Y.S.2d 929, 932 (1st Dep't 1992)).

Unquestionably, once Reich cancelled his contract with Gruntal, removed his funds, and opened accounts at another brokerage firm, his relationship with Gruntal came to an end; there was no open Gruntal account or existing contract for Ryan Beck to assume.

Notably, Reich proffers no sworn statement to the effect that he considered himself to be a Ryan Beck customer; indeed, when asked at his deposition to identify all his current and previous brokerage accounts, Ryan Beck was conspicuously absent from the list. <u>See</u> Reich Dep. (#90 [Ex.A]) at 6-7.  That omission is entirely understandable, inasmuch as he does not dispute that he closed his Gruntal accounts, and transferred all of his assets to another firm, *more than one year prior* to the acquisition. <u>See</u> <u>id.</u> at 31-32; 1/21/03 Tr. at 85-89, 92, 110. Reich never maintained any assets at Ryan Beck, never engaged in any transactions through or with Ryan Beck, never received a monthly statement or other communication from Ryan Beck (apart from the "Dear Client Letter"), and had no dealings whatsoever with representatives of Ryan Beck. <u>See</u> Reich Dep. (#90 [Ex.A]) at 31-33; 1/21/03 Tr. at 89, 114-16.

"Under New York contract law, . . . [i]f there is no meeting of the minds on all essential terms, there is no contract. This is because an enforceable contract requires mutual assent to the essential terms and conditions thereof." <u>Opals on Ice</u>, 320 F.3d at 372 (quoting <u>Schurr v. Austin Galleries of Ill.</u>, 719 F.2d 571, 576 (2d Cir. 1983)) (internal citations and quotation marks omitted).  With respect to Reich and Ryan Beck, "it is clear from the record that there was no

meeting of the minds, and no contract was ever formed." <u>Opals on Ice</u>, 320 F.2d at 371-72.

Therefore, there was no agreement to arbitrate.

In spite of these facts and legal principles, Reich advances the notion of an "implied contractual relationship between Ryan, Beck and Perry Reich" (1/21/03 Tr. at 93), and asserts that he "must be deemed to have been a 'customer' of Ryan, Beck." Reich Mem. (#105) at 1. In support of this argument, he cites his receipt of the "Dear Client Letter," and his ability to access his account information -- showing a zero balance -- through the Ryan Beck website sometime after April and prior to October 2002. <u>See</u> Reich Mem. (#105) at 1-2; 1/21/03 Tr. at 89.[32] However, plaintiff's unchallenged proof as to the applicable records retention policy refutes any inference that Gruntal's transfer of the file to Ryan Beck, Reich's receipt of the "Dear Client Letter," and the inclusion of his account information in the clearing firm's database, resurrected an otherwise dead account. <u>See</u> <u>Gruntal & Co. v. Steinberg</u>, 843 F.Supp. 1, 12 (D.N.J. 1994) (rejecting suggestion that the acquiring entity's "mere possession of documents relating to" the investors' account at the acquired entity "requires a finding" that the acquirer is "bound by" the predecessor's contract with the investors).

It is uncontroverted that Pershing LLC ("Pershing") -- the clearing firm that served as

---

[32] Ryan Beck responds that any such on-line access would at all times have revealed that Reich's accounts were "closed." <u>See</u> Pl. Supp. Br. (#90) at 3-4; Deposition of Dennis Tobin ("Tobin Dep.") at 27, appended as Exhibit B to Pl. Supp. Br. (#90); 1/21/03 Tr. at 106. For purposes of this motion, the Court will assume otherwise, given Reich's (undocumented) assertion to the contrary. <u>See</u> Reich Dep. (#90 [Ex.A]) at 19-23. Nevertheless, for all intents and purposes, the account was closed -- whether or not so labeled on the website.

the "back office" and handled "operational functions" for Gruntal and for Ryan Beck[33] --

typically "maintains an account with the 'closed' designation for approximately 18 months,"

during which time the customer would not be able to engage in transactions without first

arranging to reopen the account. Pl. Supp. Br. (#90) at 6-7 (citing Tobin Dep. at 23-26). As

Reich closed his accounts in April 2001, his name was not scheduled to be purged from the

clearing firm's list of open and closed accounts until October 2002. See Pl. Supp. Br. (#90) at

7-8; Affidavit of Linda Scorsone in Support of Ryan, Beck's Motion for Summary Judgment

("Scorsone Aff." [#91]) at ¶ 3; DelleCave Aff. (#107) at ¶ 3. The "Dear Client Letter" was sent

to all account-holders whose files had not yet been purged. For those whose accounts had been

closed in 2002, the notification of the transfer had some significance, as those former Gruntal

customers needed to be sent 1099 tax information forms in early 2003. Rather than delay the

issuance of the "Dear Client Letters" by first creating a system to sort out those whose accounts

had been closed but not yet purged, Pershing sent the letter to all Gruntal customers and former

customers whose account information had not been purged. See Scorsone Aff. (#91) at ¶ 3;

DellaCave Aff. (#107) at ¶ 3; Berson Aff. (#55) at ¶ 7.

In similar circumstances, also involving the Gruntal acquisition by Ryan Beck, the

district court in Ryan Beck & Co. v. Campbell, No. 02 C 7016, 2002 WL 31696792 (N.D. Ill.

Dec. 2, 2002), reconsideration denied, 2003 WL 193524 (N.D. Ill. Jan. 28, 2003), issued a

preliminary injunction against further arbitration proceedings. Addressing the likelihood of

Ryan Beck's success, the court observed:

---

[33]  Affidavit of Tom DelleCave ("DelleCave Aff.") at ¶ 2 (attached as Exhibit A to
Supplemental Affidavit of Joel E. Davidson [#107]); Tobin Dep. (#90 [Ex.B]) at 21-22.

> We are convinced, at this point, that Ryan Beck never entered into any
> agreement to arbitrate with Campbell.  Campbell withdrew all the assets in
> his accounts at Gruntal by February 2002, months before Ryan Beck
> acquired the customer accounts of Gruntal.  Campbell was never a client
> of Ryan Beck.  No contracts were executed between Campbell and Ryan
> Beck.  Based on this evidence, we find that Ryan Beck is likely to prevail
> in proving that it did not enter into an agreement to arbitrate disputes with
> Campbell.

Id. at *2.

Given the record in the present ease, Reich has failed to present an issue of material fact
to support his demand that he be "deemed" to have been a customer of Ryan Beck.  Therefore,
Ryan Beck cannot be said to have assumed Reich's Client Agreement with Gruntal or its
contractual obligation to arbitrate.  Nor did Ryan Beck receive any direct benefits from Reich's
closed accounts, the Client Agreement, and/or the arbitration clause contained therein; thus,
plaintiff is not estopped from denying any duty to arbitrate with Reich.  See Thomson-CSF, 64
F.3d at 778-79.

**B.  The NASD Code**

Reich also cites the NASD Code of Arbitration Procedure as an alternative basis for
plaintiff's obligation to arbitrate Reich's claims.  As a member of that organization, Ryan Beck
is required to abide by its rules and regulations, including those provisions governing arbitration
of covered disputes.  See NASD Code of Arbitration Procedure § 10301(a).  The NASD Code
contains "two prerequisites before an NASD member can be compelled to arbitrate."  Wheat,
First Securities, Inc. v. Green, 993 F.2d 814, 820 (11th Cir. 1993).  "First, a complaining party
must be a 'customer' of the NASD member, and second, the 'dispute, claim or controversy'
must have arisen 'in connection with the business of such member.'"  Id. at 820.

The Second Circuit has emphasized that the term "customer," as used in the NASD Code, is broadly defined, "excluding only 'a broker or dealer.'" John Hancock, 254 F.3d at 59; accord Bensadoun, 316 F.3d at 176.[34] Nevertheless, as was recently made clear by the Second Circuit's opinion in Bensadoun, the term "customer" is not all-encompassing. In looking to other circuits for "guidance on the meaning of 'customer,'" the Court cited with approval the Eleventh Circuit's decision in Wheat; that case held that "'customer status . . . must be determined as of the time of the events providing the basis for the allegations of fraud, [] so that allegations against a predecessor-in-interest did not give rise to a duty to arbitrate on the part of the successor.'" Bensadoun, 316 F.3d at 177 (quoting Wheat, 993 F.3d at 820); accord Gruntal & Co. v. Steinberg, 854 F.Supp. 324, 340 (D.N.J. 1994) ("Like the acts of fraud involved in Wheat, the misconduct which is the subject of the Arbitration Proceedings took place, in its entirety, at least two months before the Steinbergs became customers of Gruntal. Because these acts were committed when the Steinbergs were not customers of Gruntal, Gruntal cannot be compelled to arbitrate with the Steinbergs by virtue of the NASD Code of Arbitration Procedure.") (citations omitted); see also Dusch, 1994 WL 374425, at *2 ("As far as the NASD Code of Arbitration requirement that an NASD member arbitrate claims upon demand of the customer, this only applied once Dusch became a customer of Prudential. Prior to her becoming a customer of Prudential, there was no agreement to arbitrate.") (citing Wheat).

Reich cites no decisions adopting his construction of the NASD Code. Instead, he relies

---

[34] For example, the Court held in John Hancock that a customer of an "associated person" could demand arbitration against an NASD member, even though the customer had no direct relationship with the member but was only a customer of the member's associated person. 254 F.3d at 59-60.

on cases like <u>John Hancock</u>, which are "materially different" (<u>Bensadoun</u>, 316 F.3d at 176), in that there the member had the ability to exercise supervisory control over its associated person at the time of the alleged misconduct.[35]  Given the unbroken line of cases rejecting the theory espoused by Reich, and the Second Circuit's recent endorsement of the analysis contained in <u>Wheat</u>, this Court rules that Reich's reliance on the NASD Code is misplaced and that the Code does not provide an independent basis for compelling arbitration of his claims.

### C.  Successor-in-Interest

Citing a provision in his Client Agreement that the contract "shall inure to the benefit of and be binding upon [the signatories] and [their] respective . . . successors and assigns," PX 2A (#90 [Ex.A]), Client Agreement at ¶ 1, Reich additionally argues that Ryan Beck is Gruntal's successor-in-interest and thus is bound by the contractual arbitration provision. <u>See</u> Reich Mem. (#105) at 3, 5-6; <u>see</u> <u>also</u> Def. Joint Mem. (#90) at 15-23 (arguing that Ryan Beck is a successor to Gruntal).  As noted earlier, the Second Circuit has recognized a series of doctrines, based on "common law principles of contract and agency law," for binding non-signatories to arbitration agreements. <u>Thomson</u>, 64 F.3d at 776; <u>see</u> <u>Smith/Enron</u>, 198 F.3d at 97.  In addition to assumption and estoppel, these principles include the same theories under which a corporation that acquires the assets of another entity can be held to have assumed the predecessor's liabilities: a "*de facto* merger" of the two entities; a "mere continuance" of the predecessor by the successor; or a fraudulent transfer. <u>See</u> <u>Freeman v. Complex Computing Co.</u>, 931 F.Supp. 1115, 1121-22 (S.D.N.Y. 1996), <u>aff'd in part, rev'd and vacated in part on other grounds</u>, 119

---

[35] <u>See</u> *supra* note 34.

F.3d 1044, 1053 (2d Cir. 1997) (expressly affirming this aspect of the appeal "for the reasons

stated by the district court."). Ryan Beck contends that none of these bases for successor

liability has been satisfied in this case. <u>See</u> Pl. Mem. (#87) at 22-27.[36]

The determination of the issue of successor liability is fact-specific. <u>See</u>, <u>e.g.</u>, <u>Beck v.

Roper Whitney</u>, 190 F.Supp.2d 524, 534 (W.D.N.Y. 2001); <u>Sweatland v. Park Corp.</u>, 587

N.Y.S.2d 54, 56 (4th Dep't 1992) (affirming denial of summary judgment motion filed by

successor corporation and noting that courts must "make, on a case-by-case basis, an analysis of

the weight and impact of a multitude of factors . . . .") (citation and internal quotation marks

omitted). The kinds of factors that the Court must analyze, "in a flexible manner," were

recently summarized by the Second Circuit:

> To determine whether such a "*de facto* merger" or "mere continuation" of the
> predecessor's business has occurred, courts consider (1) continuity of ownership;
> (2) cessation of ordinary business by the predecessor; (3) assumption by the
> successor of liabilities ordinarily necessary for continuation of the predecessor's
> business; and (4) continuity of management, personnel, physical location, assets,
> and general business operation.

<u>Nettis v. Levitt</u>, 241 F.3d 186, 193-94 (2d Cir. 2001) (reversing district court's denial of motion

to amend pleading to add claim against employer's purported successor-in-interest) (citing

<u>Sweatland</u>, 587 N.Y.S.2d at 56). "Each of these factors is relevant, but the presence or absence

---

[36] Although Ryan Beck's initial brief could be construed to seek summary judgment absolving
plaintiff of liability for the investors' underlying claims, <u>see</u> Pl. Mem. (#87) at 22-27,
plaintiff's reply brief makes clear that it is not now asking for such relief. <u>See</u> Pl. Reply Mem.
(#103) at 10; <u>see also</u> Plaintiff's Notice of Motion (#92) at 1. At the same time, plaintiff asks
the Court to "permanently stay the arbitration without ruling on the successor-in-interest
issue." Pl. Reply Mem. (#103) at 10. However, in deciding whether to permanently enjoin
the arbitration, the Court will have to address whether Ryan Beck is Gruntal's successor-in-
interest and, on that basis, bound to arbitrate with Reich.

of any single factor is not determinative." <u>Freeman</u>, 931 F.Supp. at 1122; <u>see</u> <u>Fitzgerald v.</u>

<u>Fahnestock & Co.</u>, 730 N.Y.S.2d 70, 71 (1st Dep't 2001) (reversing dismissal of complaint

alleging *de facto* merger).

From the limited record developed thus far, it appears that Ryan Beck acquired more than

just fixed assets from Gruntal; plaintiff also acquired its intangible assets, such as good will,

customer accounts, personnel, and the right to use the Gruntal name, internet address, phone

numbers, trademarks, as well as most of its office space. <u>See</u>, <u>e.g.</u>, Fakih 56.1 Stmt. (#94) at ¶¶

(e)-(p) & documents cited therein. Compare <u>Freeman</u>, 931 F.Supp. at 1123 (no *de facto* merger

where there was no continuity of "physical location, management, assets, or personnel.").

Although Gruntal initially survived the asset transfer as a distinct corporation -- albeit one that

defendants have characterized as a "shell" (<u>see</u>, <u>e.g.</u>, Def. Joint Mem. [#99] at 20) -- it filed for

bankruptcy within approximately six months of the Closing Date.[37]  Additionally, defendants

have raised questions about the adequacy of the consideration and the *bona fides* of the

transaction (<u>see</u>, <u>e.g.</u>, Fakih 56.1 Stmt. (#94) at ¶¶ (h)-(i) & documents cited therein) --factors

bearing on the issue of fraudulent transfer. <u>See</u> <u>Freeman</u>, 931 F.Supp. at 1123 ("Under New

York law governing fraudulent conveyances, a transaction is not fraudulent if it is both an

exchange for equivalent value and made in good faith.").

Little or no discovery on these issues has taken place; thus, the record has not been

sufficiently developed to enable the Court to determine whether, pursuant to any of the

aforementioned theories, Ryan Beck is bound, as Gruntal's successor-in-interest, to the

---

[37] <u>See</u> *supra* p. 8.

-32-

arbitration agreement between Gruntal and Reich. <u>See</u> <u>Calamia</u>, 2002 WL 31779991, at *6.[38]

"Under these circumstances, plaintiff should be allowed to conduct further discovery to determine whether the transaction constituted a de facto merger" or otherwise gives rise to successor liability. <u>Sweatland</u>, 587 N.Y.S.2d at 55 (citing <u>Wensing v. Paris Indus.-NY</u>, 558 N.Y.S.2d 692 at 694 (3rd Dep't 1990)).

### D. Temporary Stay of Reich's Arbitration Proceeding

Given the Court's conclusion that Reich was not a customer of Ryan Beck but that factual issues remain as to whether Ryan Beck is a successor-in-interest to Gruntal, Reich's arbitration proceeding should now be stayed pending resolution of this lawsuit. <u>See</u> <u>Bensadoun</u>, 316 F.3d at 178.[39]

### CONCLUSION

For the foregoing reasons, Ryan Beck's motions are denied in all respects. The cross-motions of the Fakihs and Jones are granted in part and, as to those investors, the issue of the scope of the arbitration clause is deferred to the arbitrators. The proceedings in this action

---

[38] Earlier in the lawsuit, in addressing Ryan Beck's motion for summary judgment on successor liability, <u>see</u> <u>generally</u> Memorandum of Law in Support of Plaintiff's Motion for Temporary and Preliminary Injunctive Relief and Summary Judgment (#2), this Court observed that, given the limited record developed to that point, there appeared to be contested factual issues that warranted denying the motion without prejudice. <u>See</u> Calendar Order dated July 31, 2002; 9/20/02 M&O at 1 n.1; 9/5/02 Tr. at 57; 1/21/03 Tr. at 51. Since that time, discovery has for the most part been limited to the issue of Reich's status as a customer of Ryan Beck. <u>See</u> 1/21/03 Tr. at 51.

[39] At the time the Court rejected Ryan Beck's request for a preliminary injunction, no discovery had taken place and the Court thus could not assess whether or not Reich became a customer of Ryan Beck. Now that the Court has concluded that Reich was not a customer, the circumstances have materially changed and, consistent with <u>Bensadoun</u>, warrant a temporary stay of the arbitration proceeding initiated by Reich.

in connection with the Fakihs and Jones are stayed pending arbitration. Reich's arbitration

proceeding is stayed pending the resolution of this lawsuit.

The Clerk of the Court shall transmit copies of this Memorandum and Order, by fax and

overnight courier, to all counsel of record.

SO ORDERED.

Dated:    Brooklyn, New York
          June 20, 2003

ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE